IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>vs.<br><br>RAMON ARMANDO LOPEZ,<br>Defendant. | MEMORANDUM DECISION<br>AND ORDER<br><br><br>Case No. 2:12-cr-261 |

Defendant Ramon Armando Lopez moves to suppress all the evidence derived from a search of the car he was driving that occurred after a traffic stop.  Because the court agrees with Mr. Lopez that the police unreasonably extended the length of his detention after an otherwise lawful traffic stop, and because the court finds that Mr. Lopez did not give the police voluntary, clear, and unequivocal assent to search his car, the court GRANTS his Motion to Suppress (Dkt. No. 37).

BACKGROUND

On May 9, 2012, Utah Highway Patrol Trooper John Sheets was working on Interstate 15 near Nephi, Utah.  (Tr. of Evid. Hr'g, at 5, 57-58, Nov. 26, 2012, Dkt. No. 43.)  Trooper Sheets received a call from Utah Highway Patrol Sergeant Steve Salas, who asked Trooper Sheets to keep an eye out for a certain car that was traveling north along the interstate.  (Tr. at 20.) Trooper Sheets also spoke with Task Force Officer Brandon Shearer, who was working with the Drug Enforcement Administration.  (Tr. at 6, 24.)  Officer Shearer discussed the same car with

Trooper Sheets, gave him a license plate number, and asked him to stop it. (Tr. at 24-25.) It is unclear if Sergeant Salas or Officer Shearer specifically told Trooper Sheets that they suspected there were drugs in the car, but Trooper Sheets was left with the definite impression that he should stop the car, obtain probable cause if possible, and search it. (Tr. at 20-22, 24-25.)

Trooper Sheets identified the car as it came past him and he noted that there was a towel covering up the right front window. (Tr. at 6, 25.) Such an obstruction is a traffic violation in the State of Utah, and Trooper Sheets pulled the car over for this violation. (*Id.*) Trooper Sheets came up to the car and tried to speak with its occupants, but immediately determined that Mr. Lopez, the driver, could not speak English. (Tr. at 26-27.) Because Trooper Sheets can only understand a little Spanish, he communicated with the passenger Janeth Lopez instead and used her as an interpreter. (Tr. at 27-28.) Trooper Sheets testified that he noticed six air fresheners in various locations in the car and also observed that there were non-factory screws in the center console. (Tr. at 8, 53-54.)

Ms. Lopez voluntarily accompanied Trooper Sheets to his patrol car while he checked Mr. Lopez's license and the car's registration. (Tr. at 34.) The information on both the license and the registration was valid, but the car was registered to a third party. (Tr. at 28, 33.) According to Trooper Sheets, Ms. Lopez explained that she and Mr. Lopez were traveling to Salt Lake City from California to return the vehicle to a relative. (Tr. at 9-10, 34-36.) The two had intended to buy the car, but determined that it was too expensive when they attempted to register the car in California. (*Id.*) The two were planning to fly back to California from Salt Lake City. (*Id.*) Trooper Sheets testified that this fact caused him suspicion, because he believed that the cost of one-way return flights for two people would be more expensive than the cost to register

the car. (Tr. at 36.) Trooper Sheets did not ask any additional questions about the cost of flights, the possibility that the pair might have award miles, or the long-term costs of car ownership and registration in California. (Tr. at 36-37.) In her affidavit, Ms. Lopez testified that she was later able to purchase a ticket and fly back to California for approximately $207. (Lopez Aff. ¶ 10, Jan. 2, 2013, Ex. A to Dkt. No. 46.)

While Trooper Sheets was in the patrol car asking Ms. Lopez about her travel plans, Officer Shearer arrived. (Tr. at 10.) Officer Shearer brought with him his dog Jet, who was trained and certified to detect drugs. (Tr. at 40, 66.) Officer Shearer testified that, in his experience, Jet was well-trained and reliable when he was deployed to search for drugs. (Tr. at 66-67.) After Ms. Lopez had returned to the car and was waiting for Trooper Sheets, Officer Shearer commanded Jet to sniff around Mr. Lopez's car. (Lopez Aff. ¶ 5; Tr. at 66.) Jet did not indicate that there were any drugs in or around the car. (Tr. at 67.)

Given the circumstances, including Jet's failure to detect the presence of any drugs, Trooper Sheets testified that he believed he would need to obtain Mr. Lopez's consent in order to search the car. (Tr. at 46.) Trooper Sheets went back to the car and returned Mr. Lopez's license and the car registration. (Tr. at 11.) He testified that he also issued a warning citation for the window obstruction. (*Id.*) Trooper Sheets did not tell Mr. Lopez or Ms. Lopez that they were free to leave. (Tr. at 52-53; Lopez Aff. ¶ 6.) Instead, Trooper Sheets testified that he asked if he could speak with them and that they responded that he could. (Tr. at 11.) Ms. Lopez remembers this exchange differently. She stated in her affidavit that Trooper Sheets immediately began questioning her and Mr. Lopez when the trooper returned to the car. (Lopez Aff. ¶ 6.)

Trooper Sheets challenged the pair about the travel story that Ms. Lopez had related and

eventually asked if there were drugs in the car. (Tr. at 44-45.) Ms. Lopez spoke with Mr. Lopez in Spanish and then told Trooper Sheets that there were not. (*Id.*) In her affidavit, Ms. Lopez states that Trooper Sheets was leaning in the passenger window as he spoke. (Lopez Aff. ¶ 6.) Trooper Sheets and Ms. Lopez recount different versions about what happened next.

According to Trooper Sheets, he asked Ms. Lopez if he could search the car. (Tr. at 45.) Ms. Lopez relayed his request to Mr. Lopez. (Tr. at 46.) After a brief hesitation, Mr. Lopez spoke to Ms. Lopez in Spanish and Ms. Lopez then told Trooper Sheets that he could search the vehicle. (Tr. at 47-48.) Trooper Sheets testified that he did not recall the exact words she used. (*Id.*)

According to Ms. Lopez, Trooper Sheets stated that he wanted to search the car, a statement to which Ms. Lopez responded, "No, what for?" (Lopez Aff. ¶ 6.) Trooper Sheets then told Ms. Lopez to tell Mr. Lopez that he wanted to search the car. (*Id.*) Ms. Lopez says that she relayed this information to Mr. Lopez, who looked confused and didn't respond for a minute. (*Id.* ¶ 8.) Eventually, he shrugged his shoulders, nodded, and said "Sí." (*Id.*) Ms. Lopez did not understand what Mr. Lopez meant by his actions. (*Id.*) Immediately after Mr. Lopez made this statement, Trooper Sheets ordered the pair to get out of the car and commenced a search. (*Id.* ¶ 9.)

During this exchange, Trooper Sheets did not attempt to use the standard Utah Highway Patrol written consent forms, which are translated into Spanish. (Tr. at 50.) Trooper Sheets also testified that he had been issued a patrol car about a month earlier that did not have audio or video recording equipment. (Tr. at 18-20.) As a result, there is no audio or video recording of the incident.

During the search, Officer Shearer commanded Jet to search inside the car, but Jet did not make any sign that indicated the presence of drugs. (Tr. at 70-71.) Despite this negative indication, Trooper Sheets and Officer Shearer continued to investigate and eventually noticed some suspicious bondo putty in an area where the carpet appeared to have been moved. (Tr. at 72-73.) The officers then found a compartment containing drugs that were identified and seized. (*Id.*)

It is unclear how much time elapsed between the initial stop and the search of the car. Trooper Sheets testified that he stopped the car at 10:51 a.m. and made the arrest around 11:23 a.m. (Tr. at 51-52.) But Officer Shearer testified that his best estimate was that he did not command Jet to search for drugs until 11:30 a.m. (Tr. at 74-75.)

## ANALYSIS

### I. Standard for a Motion to Suppress

Because these facts involve a warrantless search, "the government bears the burden of proving the reasonableness of a search or seizure." *United States v. Kitchell*, 653 F.3d 1206, 1215 (10th Cir. 2011) (citation omitted). When considering a motion to suppress, "the credibility of witnesses, the weight accorded to evidence, and the reasonable inferences drawn therefrom fall within the province of the district court." *United States v. DeJear*, 552 F.3d 1196, 1200 (10th Cir. 2009) (citation omitted).

### II. Unlawful Detention

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. A traffic stop constitutes a seizure and must be both justified at its inception and reasonably

limited in scope. *United States v. Rice*, 483 F.3d 1079, 1082 (10th Cir. 2007). Although Mr. Lopez contends that the real reason he was stopped was because Trooper Sheets had been contacted by Officer Shearer and Sergeant Salas, he does not deny that Trooper Sheets legally pulled him over because of the rolled-up towel in the window. But the court must also consider whether the stop was reasonably limited in scope.

A justifiable stop must not exceed the reasonable duration required to complete the purpose of the stop. *Florida v. Royer*, 460 U.S. 491, 502 (1983). Once this purpose is completed, a driver must ordinarily "be allowed to proceed on his way." *United States v. Wisniewski*, 192 F. App'x 749, 754 (10th Cir. 2006) (citations omitted). Two exceptions to this rule are when "(1) the officer develops an objectively reasonable and articulable suspicion that the driver is engaged in some illegal activity, or (2) the initial detention becomes a consensual encounter." *United States v. Davis*, 636 F.3d 1281, 1290 (10th Cir. 2011).

A.  Reasonable Suspicion

The court finds that Trooper Sheets did not have any reasonable suspicion to prolong the stop after he returned the license and registration to Mr. Lopez. Trooper Sheets testified that three pieces of evidence caused him suspicion. First, he was concerned that the car was not owned by either of its current occupants and found that Ms. Lopez's story about returning the car was not credible. But Trooper Sheets acknowledged that Ms. Lopez give him the correct name of the person to whom the car was registered and that both Mr. Lopez and Ms. Lopez had legal identification. Trooper Sheets also admitted that he did not inquire about any of the facts that might have dispelled his suspicions concerning Ms. Lopez's story, such as the cost of airfare back to California or the cost of maintaining the vehicle registration over time.

Second, Trooper Sheets stated that he found the presence of after-market screws in the car's console area to be suspicious. But Trooper Sheets also admitted that these screws were commonly used in repairs. In any event, Trooper Sheets did not appear to be too alarmed by the screws because the console area was the last place he examined during his search. (Tr. at 54-55.) Finally, Trooper Sheets testified that he was suspicious about the multiple air fresheners he found in the car. He did not, however, ask Ms. Lopez any questions about the air fresheners.

The court must find reasonable suspicion "based upon the totality of the circumstances, taking into account an officer's reasonable inferences based upon training, experience, and common sense." *Rice*, 483 F.3d at 1083-84 (citations omitted). Accordingly, the court notes that not only was the evidence cited by Trooper Sheets insufficient to establish a reasonable suspicion, but any suspicions that Trooper Sheets may have had should have been dispelled when the dog, Jet, did not indicate the presence of any drugs after Officer Shearer commanded him to search around the outside of the car.

The United States asserts that, in addition to the air fresheners and other evidence cited by Trooper Sheets, the court should consider the fact that both Sergeant Salas and Officer Shearer believed that the car was of interest. But the United States did not present any evidence about why the drug task force suspected that Mr. Lopez had drugs in his car. The court can evaluate the existence of reasonable suspicion only on the basis of the evidence that was presented.

Finally, Trooper Sheets himself admitted that when he returned to the car with Ms. Lopez and issued the warning citation, he did not have a basis that would allow him to detain the pair further. (Tr. at 46.) At this point, Ms. Lopez and Mr. Lopez had been detained for what may have been forty minutes or more so that Trooper Sheets could ostensibly investigate a window

obstruction.[1]  Such a long detention was not justified given Trooper Sheets's stated purpose for the stop.

For the reasons discussed above, the court agrees that there was no "reasonable suspicion of criminal activity, apart from [the towel blocking the window], sufficient to prolong the stop beyond investigation of the traffic offense." *United States v. Guerrero-Espinoza*, 462 F.3d 1302, 1308 (10th Cir. 2006).

B.  Consensual Encounter

The United States relies on the second exception to prolong a stop—namely, that Mr. Lopez consented to a continued encounter.  The Tenth Circuit "follows the bright-line rule that an encounter initiated by a traffic stop may not be deemed to be consensual unless the driver's documents have been returned." *Id.* at 1308-09 (citations omitted).  But returning a driver's documents is not "always sufficient to demonstrate that an encounter has become consensual." *Id.* at 1309 (citations omitted).  Once documents have been returned, courts examine whether "the driver . . . has an objective reason to believe that he was not free to end his conversation with the law enforcement officer and proceed on his way." *United States v. Sandoval*, 29 F.3d 537, 540 (10th Cir. 1994).

Here, Trooper Sheets did not tell Mr. Lopez that he was free to go or otherwise indicate that the stop was finished by disengaging from the communication.  Trooper Sheets testified that

---

[1] The United States has not provided consistent evidence about the total time that the traffic stop and investigation lasted, but Officer Shearer testified that he did not command Jet to search for drugs until almost forty minutes after the initial stop occurred. (Tr. at 51-52, 74-75.) While it is unclear if Officer Shearer was referring to the first search (before Trooper Sheets returned Mr. Lopez's documents) or the second search (that occurred inside the car), the court finds that either interpretation indicates that Mr. Lopez and Ms. Lopez were detained for a lengthy period of time.

he asked the pair if he could ask them further questions, but Ms. Lopez testified that Trooper Sheets immediately began questioning "in a very accusatory voice" whether there were drugs in the car. (Lopez Aff. ¶ 6.) The court received Ms. Lopez's statement as an affidavit and not in the form of live testimony, making it difficult to evaluate her credibility. But the court notes that the United States stipulated to the admission of her testimony by affidavit and chose not to cross examine Ms. Lopez. The court is also without the aid of a video or audio recording, which are commonly used in these situations. In any event, the United States does not deny that Trooper Sheets was leaning into the window, making it unlikely that Mr. Lopez would have assumed that the encounter was over and making it difficult for Mr. Lopez to leave without causing injury to the officer. It is also undisputed that Trooper Sheets told the pair that he did not believe their story, making it unlikely that Mr. Lopez felt he could depart before responding to the Trooper's suspicions. Finally, Mr. Lopez and Ms. Lopez had already been detained for a lengthy period of time, multiple officers had arrived on the scene, and a dog had already circled the car. Under the circumstances, the court finds that the traffic stop had not changed into a consensual encounter. As a result, the court holds that Mr. Lopez was unlawfully detained after Trooper Sheets returned Mr. Lopez's documents to him.

    C.  Removal of Taint

    Assuming that Trooper Sheets obtained a valid consent from Mr. Lopez to search his car, a question that the court addresses below, a further "question remains as to whether [Mr. Lopez's] consent to the search of his vehicle cleansed the taint of the unlawful detention, thereby validating the search." *United States v. McSwain*, 29 F.3d 558, 562 (10th Cir. 1994). The court examines the totality of the circumstances, but especially notes "the temporal proximity of the

illegal detention and the consent, any intervening circumstances, and, particularly, the purpose and flagrancy of the officer's unlawful conduct." *Id.* (citations omitted).

In *McSwain*, the court found that a driver's consent to search occurred only minutes after the illegal detention. *Id.* at 563. The court also found that there were no intervening circumstances and that, as a result, "there was no break in the causal connection between the illegality and the evidence thereby obtained." *Id.* (citations omitted). Finally, the court found that the additional questioning that occurred in that case had "a quality of purposefulness" because the officer embarked on "a fishing expedition in the hope that something might turn up." *Id.* (citation omitted). Based on these findings, the *McSwain* court held that the defendant's eventual consent to search did not remove the taint of the officer's illegal actions.

Here, Mr. Lopez's alleged consent also occurred within minutes after Trooper Sheets returned Mr. Lopez's documents to him. There were no intervening circumstances, since Trooper Sheets's request to search the car was part of a line of questioning he began as soon as he returned the license and registration. Finally, at the time when Trooper Sheets engaged Mr. Lopez in additional conversation, Trooper Sheets did not have an articulable suspicion of criminal activity. His additional questions were designed to see if something would turn up or if Mr. Lopez would implicate himself. And Trooper Sheets initiated those questions only after first stating that he believed Mr. Lopez and Ms. Lopez were being dishonest about returning the car for the reasons they gave.

Given the totality of the circumstances, the court finds that the taint of the unlawful detention had not been removed and that Mr. Lopez's consent, if in fact he gave it, was invalid. As a result, the court suppresses the evidence found during the search.

**III.     Consent to Search**

The court's ruling is supported by the court's additional finding that Trooper Sheets did not obtain Mr. Lopez's voluntary and unequivocal consent to search the car.  Under the Fourth Amendment, a search must be conducted under a warrant issued upon probable cause except in "a few specifically established and well-delineated exceptions." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (citations omitted).  One of those exceptions is a search that is conducted with the consent of the party being searched.  *See id.*  The United States bears the burden of proving voluntary consent by a preponderance of the evidence.  *Id.* at 222.  The United States must proffer "'clear and positive testimony that consent was unequivocal and specific and freely given.'  Furthermore, the government must prove that this consent was given without implied or express duress or coercion." *United States v. Sanchez*, 608 F.3d 685, 690 (10th Cir. 2012) (quoting *United States v. Taverna*, 348 F.3d 873, 878 (10th Cir. 2003)).  Finally, the court should "indulge every reasonable presumption against the waiver of fundamental rights and there must be convincing evidence that such rights were waived." *United States v. Lopez*, 777 F.2d 548 (10th Cir. 1985).

The evidence in this case does not demonstrate that Mr. Lopez clearly and voluntarily consented to the search of his car.  Trooper Sheets testified that he did not understand what Ms. Lopez said to Mr. Lopez in Spanish after he asked her if he could search the car.  (Tr. at 46.)  Ms. Lopez described the trooper's request as a statement, not a question: "Trooper Sheets told me to tell Mr. Lopez that he wanted to search the car."  (Lopez Aff. ¶ 6.)  As the court has mentioned before, there was no video or audio recording of the event to aid the court's determination of what was said.  Trooper Sheets testified that Mr. Lopez hesitated before answering his question

and that he was not sure what that hesitation signified.  (Tr. at 46.)  Ms. Lopez also stated that she didn't know what Mr. Lopez understood or what he meant when he said, "Sí."  The court finds that, in this context, Mr. Lopez's single-word response does not demonstrate that he understood that Trooper Sheets was asking permission to search the car.  It is also unclear exactly what happened during the encounter, as Trooper Sheets testified that it was Ms. Lopez who conveyed Mr. Lopez's response, whereas Ms. Lopez testified that Trooper Sheets ordered the pair out of the car immediately after Mr. Lopez's one-word response.  Such ambiguity is insufficient to show that Trooper Sheets was able to obtain Mr. Lopez's clear consent.

There are a number of actions that Trooper Sheets did not perform that, while not required to obtain consent, could have supported the assertion of the United States that Mr. Lopez's consent was voluntary and unequivocal.  For instance, Trooper Sheets did not provide Mr. Lopez with a written form and Spanish translation that was prepared by the police agency for the purpose of verifying a subject's consent.  (Tr. at 50.)  Trooper Sheets did not inform Mr. Lopez that he was free to leave and that he had a constitutional right to decline to give consent. *See United States v. Ward*, 961 F.2d 1526, 1533 (10th Cir. 1992) (stating that an explanation to an individual of her constitutional rights, particularly Fourth Amendment rights, is important because it shows the individual that the police are prepared to respect the assertion of those rights).

Given the use of Ms. Lopez as an interpreter, the difficulties in communication with Mr. Lopez, the equivocal nature of Mr. Lopez's response, the lack of available evidence about what words were actually used, and Trooper Sheets's failure to utilize any additional methods to assure himself that Mr. Lopez understood what was happening, the court finds that the United

States has not satisfied its burden to prove that Mr. Lopez's consent was voluntary and unequivocal.

Because the court finds that Mr. Lopez did not consent to the warrantless search of his car, the court suppresses the evidence obtained during the search for this additional reason.

## CONCLUSION

For the reasons stated above, the court GRANTS Mr. Lopez's Motion to Suppress.

SO ORDERED this 26th day of February, 2013.

BY THE COURT:

_____
ROBERT J. SHELBY
United States District Judge